ISAAC MORSE AND OTHERS *v*. NATHAN H. CHURCHILL.

*Adverse Possession.   Presumption.*

Where adjoining owners, having a well defined and recognized straight line between their lands, built together a zig-zag slash fence, wherever they could build the cheapest and easiest, following rocks and ledges where they could do so, and not pretending to build on the true line, it was *held* that possession to such fence would not be available to either owner to gain title beyond the true line; nor to their grantees except under a claim of ownership.

The presumption that possession was adverse may be rebutted by proof that in its origin it was permissive; and sometimes the condition of the property and the circumstances accompanying the occupancy itself will rebut the presumption that it was adverse or under a claim of right.

In this case, there being a rail fence on a portion of the true line and the zig-zag slash fence diverging in places from the true line, apparently for convenience only, it was *held* that a referee or jury trying the case might properly infer, under the circumstances of the case, that occupancy between the straight true line and the slash fence was not under a claim of title.

TRESPASS, *quare clausum fregit*.   The case was referred to a referee, who reported as follows:

" The plaintiffs and defendant are adjoining proprietors of land in the town of Leicester, and were on the 1st day of June, 1867, the plaintiffs' land lying south of the defendant's.

" The plaintiffs claim title to the *locus in quo*, by deed from E. H. Weeks, administrator of the estate of Gilbert Noyes deceased, deed dated March 27, 1860.   The defendant claims title by deed, from J. L. Leonard, dated November 19, 1863, and also by possessory title, acquired by more than fifteen years uninterrupted possession.   Both the plaintiffs and the defendant went into possession when they took their deeds.   The defendant also introduced a copy of a deed dated July 2, 1860, from Enoch Paine to J. L. Leonard, and one dated April 29, 1845, from Enoch Alden to Enoch Paine.   The plaintiffs claimed to recover of the defendant for breaking and entering their close on the 1st day of June, 1867, and cutting and drawing away a pine tree.   I find that the land, on which said pine tree stood, is embraced in the boundaries and descriptions in the deed from Weeks to the plaintiffs, above referred to, and that it stood about twenty feet south of the plaintiffs' north line, and on their land, unless the court shall decide that the defendant has gained title to said land by possession, as will be hereafter more fully set forth.   I find that the true line between the plaintiffs' and the defendant's land, as originally surveyed, run out and marked, is a straight line one hundred and

thirty rods long. Some fifty years or more ago, one Stanley owned and possessed the lot now owned by the defendant, and Gilbert Noyes owned the land now owned by the plaintiffs. How long they continued to be adjoining proprietors did not fully appear before me. On the east end of this dividing line between the plaintiffs' and the defendant's land, is a rail fence extending westerly on the straight line some sixty or seventy rods; this rail fence was built by the adjoining proprietors of these two lots, some time previous to 1828, and passes through a swamp a few rods wide, near the east end, and then extends on westerly to near the foot of the hill, and is exactly upon this straight line all the way.   *   *   *   *   *   *   *

In 1828, Stanley and Gilbert Noyes got together and cut a *slash* fence, commencing at the west end of the rail fence and extending on up the hill westerly toward the north-west corner of Noyes' (now plaintiffs') lot. The timber was scarce and the ground broken and ledgy, and they mutually concluded and agreed to build the *slash* fence. wherever they could build it the cheapest and easiest; not trying or pretending to build it on the line, but go on wherever they could do it the most conveniently, and build a *slash* fence which would prevent the cattle and sheep straying from one lot to the other; consequently, in building the *slash* fence, they sometimes followed along on the tops of the rocks and sometimes on old trees which they found down. In this manner they built a *zig-zag* fence, and most of it was some feet or rods south of the true line between the lots, as then known and understood by them. This *slash* fence was run up to within twenty or thirty rods of the west line of the now-plaintiffs' lot, and when near the upper end of it it turned northerly so that if it had been extended it would have struck the north-west corner of the lot. This fence, both rail and *slash*, was built by the adjoining proprietors of these two lots, and has been repaired by them down to within a very few years. It seems that since the plaintiffs have owned and occupied the lot, one V. Stanley has owned and occupied land adjoining the plaintiffs on the north, for a short time, and *did*, soon after the plaintiffs bought, assist one of them in repairing this *slash* fence; (this V. Stanley is a son of the Stanley who helped Noyes build the fence in the first place;) and while they were repairing the fence as aforesaid, Stanley told the plaintiff that the slash fence was not on the line, and pointed out to him where the north-west corner was.

The straight line, 130 rods, was a line well marked, with well established, permanent boundaries and corners, which where well known to Noyes and his son, and by Stanley and his family.

Whether Leonard, or Paine, or Alden knew anything about the corners or lines did not appear. It did appear that the plaintiffs' lot had been once or twice surveyed and the lines run out and measured, and that the surveys and measurements were in exact accordance with the courses and distances given in the plaintiffs' deed from Weeks, and made the straight line the true line between the lots. I find that ever since the building of said rail and slash fence, the defendant and his grantors have been in the peaceable and exclusive possession of all the land on the north side of said fence, and that nobody has ever disturbed them in that possession, until 1867, when this pine tree was cut. The acts of possession by the defendant and his grantors have consisted in pasturing the land and cutting and drawing away timber and wood. The tree, for which the plaintiffs claim to recover, stood on the north side of the *slash* fence about twenty or twenty-five feet south of the straight line. * * * I believe there was no testimony that any body had repaired the slash fence since the plaintiffs and V. Stanley fixed it after the plaintiffs bought. The breaking and entering, and cutting and carrying away the tree, was done by the defendant's servants and hired men, by his directions. * * * If the defendant had not gained possessory title to the *locus in quo*, I find and decide that he is liable as alleged in the plaintiffs' declaration, * * * * and that the plaintiffs recover of the defendant twelve dollars, unless the court shall hold that, upon the foregoing statement of the facts, the defendant has gained title by possession to the *locus in quo*, in which event, I find that the defendant recover his costs."

Judgment for plaintiff on this report, for twelve dollars and costs, at the December term, 1868, Pierpoint, C. J., presiding, to which the defendant excepted.

*George L. Fletcher*, for the defendant.

*J. Q. Hawkins*, for the plaintiffs.

The opinion of the court was delivered by

Peck, J. As the referee finds that the tree, the cutting of which constitutes the substantial trespass complained of, stood upon the plaintiffs' side of the true original division line between the parties, and that it stood on the plaintiffs' land, unless the defendant had gained title to the strip in question by possession,

the question is presented, whether, upon the facts found by the referee, the defendant had so gained title.

The occupancy of the strip in question by the defendant and his grantors, between the true division line and the zig-zag slash fence, on which the tree in question stood, gives the defendant title if that possession was adverse, that is, under a claim of title. The referee does not find that that possession was under a claim of right or title, or that it was adverse ; but reports certain facts bearing upon that, characteristic of the possession, and leaves it to the court to decide whether the defendant gained title by such possession.  It appears that when Gilbert Noyes owned the land now owned by the plaintiffs, and Stanley owned the land now owned by the defendant, the straight line 130 rods, marked on the plan and found by the referee to be the true line, was a line well marked with well established permanent boundaries and corners, well known to and recognized by Noyes and Stanley while they owned their respective parcels.  In addition to this, on the eastern portion of this division line they had a rail fence on this straight line, extending westerly sixty or seventy rods, built previous to 1828, and which still remains there.  When Noyes and Stanley, in 1828, the then adjoining proprietors, built the slash fence, commencing at the west end of the rail fence and extending on westerly up the hill over the rocks and ledges, running it zig-zag for convenience wherever they could build it the cheapest and easiest, knowing that it did not follow the line, no *adverse* occupancy was thereby commenced beyond the line which was then mutually recognized as the true division line.  Nor would any such possession commence, which would be available to the defendant to gain title to the land up to the slash fence, until the defendant or his grantors claimed to that fence.  The referee does not find that the possession relied on by the defendant was under any such claim.  It is true that, as a general rule, when one is shown to have been in possession for fifteen years, apparently as owner, and such possession is not explained or otherwise accounted for, it will be presumed to have been adverse.  But this presumption may be rebutted by proof that the possession in its origin was not ·adverse, but permissive ; and sometimes the

condition of the property and the circumstances accompanying the occupancy itself will rebut the presumption that it was adverse or under a claim of right. In this case, both concur to rebut this presumption. The most favorable view for the defendant that can reasonably be taken of the case is, to inquire whether the occupancy by the defendant and those under whom he claims, can be inferred, from the facts reported, to have been under a claim of title to the strip of land between the true line and the slash fence of the place in question. So far as the occupancy of Stanley is concerned, who assisted in building the slash fence under the circumstances reported, clearly no such inference could be drawn. The grantees of Stanley, and subsequent occupants, may not have been informed of the understanding under which that slash fence was built, but there was much in the appearances to indicate that the zig-zag slash fence was not the true line in all places, or recognized and claimed by the adjoining proprietors to be such. For a distance of sixty or seventy rods the rail fence on the true straight line would indicate that the adjoining proprietors claimed only to that line through the whole distance of their adjoining lands if there was nothing to show the contrary. This slash fence indicated the general course of the line there to be the same as at the rail fence. The fact that the slash fence was irregular in its course and diverged from the straight line as convenience required over the rough ground, apparently in order to have the rocks and ledges aid in making the fence, would not necessarily indicate that the line, to which the adjoining proprietors claimed, was thus crooked. The whole appearance would rather indicate to a common observer that the adjoining proprietors were claiming to the straight line indicated by the rail fence, and that the slash fence diverged in places from that line for temporary convenience only, and not on account of the line being in exact accordance with the slash fence. If a common observer, on viewing the premises and noticing the manner of occupancy, would so infer, then, upon the facts reported, the referee or a jury might infer that the occupancy between the straight true line and the slash fence was not under claim of title. And clearly, as the referee has not found that such possession was adverse or

under a claim of right or title, the court can not infer it from the facts reported. The tree, therefore, was cut by the defendant on the plaintiffs' land.

It is further insisted that, as the defendant was in possession of the *locus in quo* at the time of the alleged trespass, the action of trespass is not the proper remedy. Whether the character of the defendant's possession was such as to defeat the action of trespass for entering and cutting the tree, had the question been seasonably raised, we need not decide, for it does not appear that any objection was made before the referee to the form of action. This objection not having been made before the referee, it can not avail the defendant here.

Judgment affirmed.